**JS-6**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAUDIA CIAMPA, | Case No. 8:24-cv-02556-DOC-ADS |
|     Petitioner, | |
| | |
|     vs. | **ORDER AND JUDGMENT** |
| | **GRANTING PETITION FOR THE** |
| ERIC HOWARD NICHOLS, | **RETURN OF BABY ETHAN TO** |
|     Respondent. | **ITALY;[1] FINDINGS OF FACT &** |
| | **CONCLUSIONS OF LAW** |

---

[1] This opinion serves as a Findings of Fact and Conclusions of Law. Additional enumerated Findings of Fact and Conclusions of Law are appended to this order.

This case arises under the Hague Convention's International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§9001 *et seq.* The parties are the parents of Baby Ethan and they disagree regarding which country—the United States or Italy—is the home of their shared child. The country that is the child's home will determine their future custody arrangement. The Court held a four-day evidentiary hearing (the "trial") from February 3, 2025, through February 6, 2025. For the reasons described below, the Court **ORDERS** the return of Baby Ethan to his rightful home—the country of Italy. The parties' appropriate custody arrangements shall be determined under Italian law and under the purview of the Italian courts.

# I. BACKGROUND

## A. FACTS

The parties' relationship began in Sorrento, Italy back in 2011. Trial Transcript ("Trial Tr.") Feb. 4, 2025 Reporter's Transcript ("Rep. Tr."), 7. The mother, Claudia Ciampa ("Mother" and "Petitioner"), is an Italian national who has lived in Italy her whole life. *Id.* at 15. The father, Eric Howard Nichols ("Father" and "Respondent"), is a United States citizen who moved to Italy thirteen years ago. Trial Tr. Feb. 5, 2025 Rep. Tr., 9. Father was teaching English in Italy since 2012, and the parties met at a café. *Id.* at 10-12; Trial Tr. Feb. 4, 2025 Rep. Tr., 7. They became friends and then began a romantic relationship. Trial Tr. Feb. 4, 2025 Rep. Tr., 7-8. At this time, Mother had a five-year-old child. *See id.* The parties dated for one year beginning in 2011, and then ended their relationship. Trial Tr. Feb. 3, 2025 Rep. Tr., 21. After this, Mother then met Luigi Porzio ("Gigi") and eventually married him. *Id.* at 17. Mother had two children with Gigi. *Id.* at 16. These two children, Ettore and Clelia, are eleven and nine years old. *Id.* Mother and Gigi remain legally married as of the present time but separated by mutual agreement after nine years of being together. *Id.* at 16-17, 45.

After the mutual separation between Mother and Gigi, Mother reconnected with Father. *Id.* at 22. After dating for a while, Mother became pregnant with Father's child. *Id.* The parties never married as she is still legally married to Gigi. *Id.* at 24-25. Mother, Father, and Mother's two youngest children traveled to Cincinnati, Ohio on January 26, 2024. Trial Tr. Feb. 3, 2025 Rep. Tr., 34. Mother gave birth to Baby Ethan on February 13, 2024, in Ohio.

Respondent's Exhibit P at 1. Mother and Father obtained a U.S. Passport for Baby Ethan during their stay in the United States during the time after Baby Ethan's birth, which was only a little over a month. Trial Tr. Feb. 4, 2025 Rep. Tr., 153. On March 18, 2024, Mother, Father, Baby Ethan, and Baby Ethan's brothers and sisters returned to Mother's extended family in Italy. Trial Tr. Feb. 3, 2025 Rep Tr., 47.

After a couple months back in Italy, the parties' relationship became strained, and Mother ended the relationship with Father on August 5, 2024. *Id.* at 48. Following this, the parties negotiated a visitation schedule for Father to see Baby Ethan twice daily, from 9:00 to 11:30 am, and again from 7:00 to 8:00 p.m. *Id.* at 50-51. However, Mother found that the evening visitation interfered with Baby Ethan's sleep schedule and modified the visitation schedule to only the morning hours. *Id.* Mother feared Father having the American passport and being alone with the child, so the parties agreed that Father would leave Baby Ethan's passport with Mother during his visits and Mother would return the passport to Father at the end of his visits. *Id.* at 58.

On August 23, 2024, Mother traveled with her children to Torre Suda, Puglia on a vacation to visit Mother's brother and sister. *Id.* at 92. Father traveled separately to Puglia to maintain visitation with Baby Ethan every day and even rented an Airbnb near where Mother and her family were staying. *Id.* at 54-55. On the morning of August 30, 2024, Father appeared at the family's home for his parenting time with Baby Ethan *Id.* at 60. But unlike prior scheduled visits, Father refused to give Mother Baby Ethan's American passport. *Id.* Father then did not return Baby Ethan at the agreed upon time of 10:00 am. *Id.* In response to numerous text messages from Mother, Father falsely stated that he was spending time with the child at local beaches, zoos, and water parks. *Id.* at 61-62. Mother sent countless messages and phone calls urging for the return of the infant. *See generally* Petitioner's Exhibit 17. Baby Ethan was breastfeeding at this point in time and Mother pleaded with Father for him to return the child so that she could breastfeed him as it was causing her pain. *Id.* at 4, 7. Mother was so concerned that around 2:00 p.m. she filed a report with the local police. Trial Tr. Feb. 3, 2025 Rep Tr., 62. It was not until around 9:30 p.m. that Father finally told Mother the truth—that he had driven to

the airport with the infant, had flown to London, and was in the process of taking the child to the United States. Petitioner's Exhibit 17 at 8. Mother continuously asked where Father was taking the child, and he continually refused to disclose this information to her. *See generally* Petitioner's Exhibit 17. Father kept the breastfeeding infant from his mother for about 82 days, refusing to disclose their location in the United States. *See* Trial Tr. Feb. 3, 2025 Rep Tr., 71.

On September 5, 2024, Mother signed a Hague Application. Notice of Removal (Dkt. 1), Exhibit B-Hague Petition at 8. On September 19, 2024, the Italian Central Authority emailed a letter to the American Central Authority (the U.S. Department of Justice) requesting assistance under the Hague Convention. *Id.* This letter from the Italian Central Authority indicated that Father might be living in Mesa, Arizona, with friends based on information Mother had previously obtained. *Id.* On September 26, 2024, the U.S. Department of Justice notified the California Attorney General's Office of the Hague Application. *Id.* On October 3, 2024, the California Attorney General's Office notified the Orange County District Attorney's Office Child Abduction Unit of the application. *Id.* On October 24, 2024, the Orange County Superior Court issued an Emergency Ex Parte Order and issued a Protective Custody Warrant for Baby Ethan. *Id.* Father was served on November 19, 2024, by the Sheriff's Department of Orange County. *Id.* Baby Ethan and Mother were reunited after her arrival in the United States pursuant to an order from the Orange County Superior Court in November of 2024, and they have remained together throughout these proceedings. *See* Trial Tr. Feb. 3, 2025 Rep Tr., 71.

### B. PROCEDURAL HISTORY

Respondent removed this case from Orange County Superior Court ("Notice") (Dkt. 1) on November 21, 2024. Petitioner filed her Motion to Remand ("Motion to Remand") (Dkt. 18) the case back to state court on December 1, 2024. Respondent opposed the Motion to Remand (Dkt. 32) on December 27, 2024. The Court denied Petitioner's Motion to Remand (Dkt. 37) on January 15, 2025. The Court held a case management conference on January 21, 2025. Petitioner filed her Declaration and Offer of Proof of Prima Facie Case (Dkt. 39) on January 20, 2025, and Respondent filed his Trial Brief and Affidavits (Dkt. 41) on January 20, 2025. The Court held an evidentiary hearing from February 3, 2025, until February 6, 2025.

## II. LEGAL STANDARD

The 1980 Hague Convention on the Civil Aspects of International Child Abduction is a multilateral treaty that provides authority for the expeditious physical return of a child who has been removed or retained from the habitual residence, in violation of the custody rights of the left-behind parent. Hague Convention on the Civil Aspects of International Child Abduction pmbl., arts. 1, 3, Oct. 25, 1980, 1343 U.N.T.S. 89. The United States signed the 1980 Hague Convention in 1981, and Congress ratified the Convention in 1986. Hague Convention, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89. Italy is also a party to the convention. *Id.*; Hague Conference on Private International Law, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (Feb. 11, 2025). Congress then passed implementing legislation, the International Child Abduction Remedies Act (ICARA) in 1988. 22 U.S.C. §§ 9001–9011 (1988), Pub. L. 100–300, § 2, Apr. 29, 1988, 102 Stat. 437. The primary purpose of the Hague Convention was to preserve the status quo that existed before a child's removal, and to deter would-be abductors from removing children to other jurisdictions in search of a more sympathetic court. Pub. Notice 957, 51 Fed.Reg. 10494, 10505 (1986). The policy underlying the Convention is "the interest of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (internal citation and quotation omitted).

It is important to note at the outset that the Court's purview is limited under the Convention. The Court is not to stand as a judge of who is the better parent, as a Hague Convention case is not a child custody case. *Golan v. Saada*, 596 U.S. 666, 671 (2022) (citing 22 U.S.C. § 9001(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.")). Rather, because the country that is the habitual residence of the child is a better judge of that issue, the Court is to provide a "provisional remedy." *Id*. (quoting *Monasky*, 589 U.S. at 72). This remedy is to determine if a child was wrongfully removed or retained away from their habitual residence, and if so, to order the child's return to that nation. *Id.* at 671-72

(citing 22 U.S.C. § 9003(e)(1), § 9001(a)(4)). Whether the taking is wrongful is determined by the law of the habitual residence. *See* Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89.

Upon return of the child to their habitual residence, the custody adjudications will proceed in that forum. *Monasky,* 589 U.S. at 72. The elements of the case for return are that the person or parent petitioning for the return must show by a preponderance of the evidence that the child:

1.  Is under the age of sixteen;

2.  Has been wrongfully removed or retained;

3.  Has been wrongfully removed or retained from his or her habitual residence; and

4.  Has been wrongfully removed or retained in violation of the custody rights of the left-behind parent.

Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(1) (establishing the burden of proof).

If the petitioner has proven the elements above in accordance with their burden, the Court must order the return of the child unless a defense to return is established. Hague Convention arts. 12–13, 20, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(2). There are five narrow defenses to return, however, the only defense raised in this case is that return of the child would cause grave risk of harm to the child. Hague Convention arts. 12–13, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(2)(A); *see* Trial Tr. Feb. 3, 2025 Rep Tr., 8. Respondent must establish this defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

## III. DISCUSSION

### A. Mother's Petition for Return of Baby Ethan to Italy

As to the Mother's Petition, element one is not disputed as Baby Ethan is only one-year old as of February 13, 2025. *See* Respondent's Exhibit P at 1. As to the remaining elements, Petitioner must prove by a preponderance of the evidence that Baby Ethan's relocation violated her custody rights, as recognized under the laws of Baby Ethan's habitual residence. The Court finds that when Baby Ethan was taken at six-months-old from Italy on August 30,

2024, and flown to the United States without Mother's knowledge and consent, Italy was Baby Ethan's habitual residence. The Court also finds that Father's taking was in breach of Mother's custodial rights under Italian law, which she was exercising at the time of the wrongful taking.

### 1. Habitual Residence

The term "habitual residence" is not explicitly defined by the Hague Convention itself. A substantial body of case law however has developed to establish a standard for determining habitual residence. *Mendez v. May*, 778 F.3d 337, 346-347 (1st Cir. 2015); *Blackledge v. Blackledge*, 866 F.3d 169, 179-180 (3d Cir. 2017); *Friedrich v. Friedrich,* 983 F.2d 1396, 1401 (6th Cir. 1993); *Robert v. Tesson*, 507 F.3d 981, 989 (6th Cir. 2007); *Pfeiffer v. Bachotet*, 913 F.3d 1018, 1024 (11th Cir. 2019). A frequently cited case is *In re Bates,* a United Kingdom decision that helped define the concept of habitual residence and states: "[a]ll the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed, his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." No. CA 122.89 at 9-10, High Court of Justice, *9 Fam. Div'n Ct. Royal Court of Justice, United Kingdom (1989).

The Supreme Court in *Monasky,* further emphasized that courts should consider a broad range of factors when determining habitual residence, as this determination is "a fact-driven inquiry into the particular circumstances of the case." 589 U.S. at 79. The totality-of-the-circumstances approach often examines the "family and social environment in which [the child's] life has developed." *Id.* at 77 (internal citation omitted). The Court clarified that "[t]here are no categorical requirements for establishing a child's habitual residence—least of all an actual-agreement requirement for infants." *Id.* at 80-81. Among the factors the Court cited as relevant in this analysis are the child's age, meaningful connections with the people and place in the new country, immigration status of the caregiving parents, and the length of time the child

was physically located in a particular place. *Id.* at 78 n.3 (internal citations omitted). But this is not an exhaustive list.

Mother argues that Italy is the child's habitual residence, while Father asserts that it is the United States. *See* Trial Tr. Feb. 3, 2025 Rep Tr., 5, 10. The Court finds that Baby Ethan's habitual residence is Italy. The evidence supporting this conclusion is substantial, and any contrary suggestion is unpersuasive and strains credulity.

### a. Physical Presence

The Court will first address the physical presence of the parties and relevant family members. The Ninth Circuit in *Nisbet v. Bridger,* 124 F.4th 577, 584 (9th Cir. 2024) defined a child's habitual residence as "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." (internal quotations and citations omitted). Further, the Court stated that this approach considers whether the child "acquired a sense of environmental normalcy by forming meaningful connections and the people and places he encountered." *Id*.; *see also Monasky,* 589 U.S. at 77 (noting the Hauge Convention's explanatory report referred to a child's habitual residence as "the family and social environmental in which [the child's] life has developed" (alternation in original) (citation omitted)).

While physical presence of the child alone is not dispositive, it must be considered alongside meaningful social connections and a sense of environmental normalcy. *See id.* at 588 (citing *Monasky,* 589 at 81). However, when physical presence fails to yield meaningful social connections, courts assign it little weight in habitual-residence determinations. *Id.*

Baby Ethan was born in the United States and spent a little over a month there until Mother was able to travel back to Italy. Trial Tr. Feb. 3, 2025 Rep Tr., 35. He then returned to Italy with his parents and siblings on March 18, 2024, and remained there until his wrongful removal on August 30, 2024—a period of approximately five months. *Id.* at 35, 47. Baby Ethan is an American citizen and an Italian citizen, holding an Italian Tessera Sanitaria (social security card) and an Italian Identification card. *Id.* at 56-57.

With this background in mind, the Court focuses first on examining Baby Ethan's familial presence in Italy, rather than the United States, because he spent a majority of his young life—five months—in Italy, compared to a couple weeks after his birth in the United States. Given that habitual residence is determined by assessing the child's meaningful connections and environmental normalcy, it is necessary to analyze the familial and social environment in Italy where he resided for a significantly longer period.

Father's Presence in Italy

Father, an American citizen, has lived in Italy for the past thirteen years. His last visit to the United States before traveling for Baby Ethan's birth, occurred "four or five years ago." Trial Tr. Feb. 5, 2025 Rep. Tr., 9, 10. During his time in Italy, Father worked as an English teacher, conducting lessons from his apartment in Sorrento. *Id.* at 10-12. He does not own property in the United States. *Id.* at 14.

Mother's Presence in Italy

Mother, an Italian citizen, has lived in Italy for forty-six years, except for brief stays in Canada and Australia lasting a few months each. Trial Tr. Feb. 3, 2025 Rep. Tr., 15. She has continuously resided in her family home in Piano di Sorrento. *Id.* Mother does not hold U.S. citizenship or a visa. *Id.* at 24-25.

Extended Family in Italy

The child's maternal grandmother and uncle live next door to Mother. *Id.* at 19-20. Additionally, one of Mother's sisters resides in the same town, while her three other siblings live in various villages throughout Italy. *Id.* Mother testified that she has numerous extended family members in Italy, but none in the United States. *Id.*

Baby Ethan's Siblings in Italy

Of particular significance is that Baby Ethan has three older siblings, all of whom were born and raised in Italy. *Id.* at 16-19. Mother's oldest daughter, Chiara, is 18 years old and primarily lived with Mother but also spent time with her father, Paolo Pastorino, who resides in Italy. *Id.* Mother's other son, Ettore, is eleven years old and her younger daughter, Clelia, is nine

years old. *Id.* Their father, Gigi, lives in Italy. *Id.* Mother and Gigi share custody of the children. *Id.*

Baby Ethan's Bonds with Family

Father attempted to disavow Baby Ethan's bonds with his family, contending that Baby Ethan lacked any connection to his extended family or siblings in Italy. Trial Tr. Feb. 5, 2025, Rep. Tr., 23, 26. However, the Court finds that Father repeatedly made misrepresentations that severely undermined his credibility. For instance, Father testified that he had never seen the maternal grandmother hold Baby Ethan because she was physically incapable of doing so. *Id.* at 107. Yet, Petitioner submitted Exhibit 23, A and Exhibit 23, B which are photographic evidence showing Father seated next to the grandmother while she held the child in her lap. Petitioner's Exhibit 23, A, B. And even after the wrongful taking, Father facilitated a video call between Baby Ethan and his maternal grandmother, whom Mother described as being "very close to Baby Ethan" *Id.* at 116; Trial Tr. Feb. 3, 2025 Rep. Tr., 70. Moreover, at the time of Baby Ethan's wrongful removal, Mother had been visiting family members in Italy, further demonstrating the child's direct connection to his maternal relatives. Trial Tr. Feb. 3, 2025 Rep. Tr., 92.

Perhaps most egregiously, Father attempted to suggest that there was a strained bond between Mother and Baby Ethan because he allegedly observed the infant trying to get out of her arms. Trial Tr. Feb. 5, 2025 Rep. Tr., 26-27. He went so far as to dispute Mother's bond with her other children. *Id.* Her oldest daughter, Chiara, however provided testimony affirming Mother's deep bond with Baby Ethan and her unwavering presence, encouragement, and love for all her children. Trial Tr. Feb. 3, 2025 Partial Transcript ("Part. Tr."), 34-35. Chiara testified that Mother is deeply involved in all of her children's lives. *Id.*

While no single factor is dispositive under the totality-of-the-circumstances standard, Baby Ethan's extended time in Italy—where his maternal family resides, including Mother's three other children—along with his significant familial and social ties to the country, strongly supports the conclusion that Italy, rather than the United States, is his habitual residence.

In *Nisbet,* the Ninth Circuit examined whether two children had acclimatized to
Scotland by assessing their connections to the people in their physical social environment,
including family, friends, and parents. 124 F.4th at 585. Unlike this case, the court there
affirmed that the children lacked meaningful ties to Scotland even though they were physically
present there because they had not formed friendships at nursery school, had no contact with
their extended family, and had a father who had been incarcerated since birth. *Id.* By contrast,
here Baby Ethan's strong relationships with both his immediate and extended family in Italy,
combined with his physical presence there for most of his life before his wrongful removal,
weigh in favor of finding Italy to be his habitual residence.

### b.  Intentions and Circumstances of Parents

The Court next addresses the parents' intent and circumstances regarding establishing
a home for Baby Ethan. For older children, courts often apply the *Monasky* factors to determine
whether the child has acclimatized to a place; however, an infant is too young to acclimatize to
their surroundings. 589 U.S. at 78. Thus, "[b]ecause children, especially those too young or
otherwise unable to acclimate, depend on their parents as caregivers, the intentions and
circumstances of caregiving parents are relevant considerations." *Id.; see also Douglas v.
Douglas*, No. 21-1335, 2021 WL 4286555, at *5 (6th Cir. Sept. 21, 2021), cert. denied (2022)
(facts concerning parental intent may be relevant to the determination whether a particular place
is the child's "home") (citation omitted). Because parents often dispute their intentions during
litigation, "the court should look at actions as well as declarations in determining [parental
intent]." *Olivia v. Espinoza,* No.: 20CV01133-JAH-DEB, 2021 WL 4554579 at *6 (S.D. Cal.
Oct. 5, 2021) (citing *Walker v. Walker,* 701 F.3d 1110, 1119 (7th Cir. 2012).
Baby Ethan's Dependency on Mother for Breastfeeding

To assess intent and circumstances, the Court considers several factors. One critical
factor is that Baby Ethan—being exclusively breastfed and under one-year old—was dependent
on Mother for care for the first six months of his life. Trial Tr. Feb. 3, 2025 Rep. Tr., 51; *see
Douglas,* No. 21-1335, 2021 WL 4286555 at *6 (noting that the eleven-month-old was
dependent on mother's care from birth to time of child's removal); *Ahmed v. Ahmed,* No. 3:16-

CV-142, 2016 WL 4691599, at *7 (E.D. Tenn. Sept. 7, 2016), aff'd, 867 F.3d 682 (6th Cir. 2017) (citing *Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004)).

Mother intended to continue breastfeeding Baby Ethan for approximately two and a half years, as she did with her other children. Trial Tr. Feb. 3, 2025 Rep. Tr., 95. However, after Father took Baby Ethan at around six-months old, Mother was forced to cease breastfeeding and had to undergo medical treatment to do so. *Id.* at 94-95. She was then unable to resume breastfeeding upon being reunited with the child in the United States. *Id.* Testimony revealed that Father wanted control over the child's feeding, frequently questioning and criticizing Mother's breastfeeding choices, including being dissatisfied with her breastfeeding in public and objecting to her feeding schedule. *Id.* at 78; Trial Tr. Feb. 4, 2025 Rep. Tr., 159-60, 180. Father even went as far as asking the pediatrician in Italy how often she should be breastfeeding. Trial Tr. Feb. 3, 2025 Rep. Tr., 78. Mother testified that Father insisted on feeding Baby Ethan from birth and required her to pump milk into a bottle to comply with his preference; if she did not, he would feed the baby formula against her wishes. *Id.* at 51-52.

Father claimed that Mother consented to formula feeding and the cessation of breastfeeding at six months, but Mother explicitly denied this in her testimony. *Id.*; Trial Tr. Feb. 4, 2025 Part. Tr., 19. Additionally, Father referenced a written agreement regarding breastfeeding, which was never produced in court. Trial Tr. Feb. 5, 2025 Rep. Tr., 57-58. He referred to World Health Organization (WHO) guidelines to support his position, yet these guidelines advise that infants should be breastfed on demand, with no bottles, teats, or pacifiers and that breastfeeding continue alongside complementary foods for up to two years or beyond. *Id.*; World Health Organization, Breastfeeding, WHO, https://www.who.int/health-topics/breastfeeding#tab=tab_2 (last visited Feb. 14, 2025). The text messages exchanged between the parties after the child's removal further illustrate that Mother never consented to Father's feeding decisions—Mother texted Father "Instead of [Baby Ethan]'s mother breast milk, you told me you are giving formula to [Baby Ethan]. Did you decide your own or you asked a pediatrician?" Petitioner's Exhibit 17 at 56.

The Court acknowledges Mother's significant role in making decisions regarding breastfeeding and affirms her right to determine how and when to nurse her child. The child's dependency on Mother, particularly for breastfeeding, underscores that the parents' intentions and circumstances never contemplated physical separation of Mother and Baby Ethan. Thus, there was no shared intent by Mother and Father for Baby Ethan to be removed from Mother's care at six months old. Therefore, if Mother could not permanently move to the United States at a point in time, it follows that the child was not meant to go either.

Trip to America for Birth of Baby Ethan

Next, the Court considers the parents' intentions and circumstances surrounding their trip to America for the birth of Baby Ethan, which lasted approximately seven weeks. In determining habitual residence, courts have frequently analyzed short trips to other countries, particularly focusing on the duration of the child's stay in the location and meaningful social connections to the place and people. *See, e.g. Foster v. Foster*, 429 F. Supp. 3d 589, 608 (W.D. Wis. 2019) (considering previous limited stays); *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) (considering period of time child was located in a place); *Holder v. Holder*, 392 F.3d 1009, 1014 (9th Cir. 2004) (considering changes in geography).

The family traveled to the United States for a fixed period of seven weeks, specifically to facilitate Baby Ethan's birth. Father's attempts to characterize this trip as a "permanent move" are inconsistent with the evidence. For instance, agreements were made with the father of Mother's younger children, Gigi, regarding their travel dates to America and their enrollment in American schools. Trial Tr. Feb. 3, 2025 Rep. Tr., 34. This agreement with Gigi granted limited permission for the children to travel to the U.S. from January 26, 2024, to March 18, 2024. *See id*. This agreement also included permission for the children's enrollment in an American school for that specific period, with no indication from their father of any intention to extend their stay. *Id.*

Moreover, although the two younger children were temporarily enrolled in an American school, Mother testified that she ensured they remained in contact with their Italian school by having them complete homework assignments from the Italian school while attending

the American school. Trial Tr. Feb. 3, 2025 Part. Tr., 9-11. This was done in light of the fact that

their time in the U.S. was intentionally temporary, with clear start and end dates during the

school year. Mother's oldest daughter, Chiara, who joined the family in America after Baby

Ethan's birth, also testified that, based on the family's discussions about the trip, she was certain

the trip was solely for the purpose of the child's birth. *Id.* at 32.

Additionally, Father's own testimony further contradicts his claim that this was a

"move." His email to his Italian students clearly stated the trip's duration and purpose, noting:

"Claudia and I will be going to America for [Baby Ethan]'s birth. . . We will be in America from

January 26th to March 18th." Petitioner's Exhibit 22 at 7. At no point did Father mention that he

would not be returning to Italy for his work, nor did he suggest that the trip was a permanent

move out of the country. Instead, he explained "[w]e explored every possible option to have

[Baby Ethan] in Italy, but every time we went to clinic or private doctor, we encountered yet

another issue. The most significant problem is that I would not be allowed to be in the room

with Claudia during and after [Baby Ethan]'s birth. Additionally, [Baby Ethan] would be taken

away from us for a few hours. Both these issues are nonnegotiable for us. Instead, in America,

Claudia, [Baby Ethan], and I will be together 100 percent of the time always!" *Id.* After the

birth, Father sent another message to his students, stating "I look forward to introducing him to

you when we return to Italy on March 18." *Id.* at 9. Furthermore, on the night before the return,

he sent a message saying "We are leaving America this evening to return to Italy. We will arrive

in Naples on Monday afternoon. So we'll see each other in person at the studio on Wednesday at

5:15 pm. I can't wait to see all your faces again!" *Id.*

Thus, the evidence overwhelmingly supports that both parents considered the trip to

the United States to be temporary and intended to return to Italy after Baby Ethan's birth.

The Hope of Moving to America

Father testified that Mother "promised" him that they were going to move to America.

Trial Tr. Feb. 6, 2025 Rep. Tr., 10. The evidence however does not support the conclusion that

the parents had a definitive plan to relocate to the United States; rather, it reflects a hope rather

than a practical or imminent move. Mother, an Italian citizen, had no U.S. visa or citizenship

status and had not applied for any type of U.S. visa between the Summer of 2022 and the birth
of her child in February 2024. Trial Tr. Feb. 3, 2025 Rep. Tr., 25; *see e.g., Kijowska v. Haines*,
463 F.3d 583, 588 (7th Cir. 2006); *In re B. del C.S.B.*, 559 F.3d 999, 1011 (9th Cir. 2009);
*Hernandez v. Garcia Peña*, 820 F.3d 782, 788 (5th Cir. 2016) (the parents' and child's
immigration status is one relevant factor in a multifactor test). Mother did not seek advice from
an immigration attorney during this time to explore obtaining U.S. immigration status. Trial Tr.
Feb. 3, 2025 Rep. Tr., 25. The parents furthermore were not married, and there were no concrete
plans for Father to marry Mother to secure a U.S. visa or citizenship. *Id.* at 26. Father himself
testified that with the birth of Baby Ethan "[they] were not talking about getting married in a
short amount of time." Trial Tr. Feb. 5, 2025 Rep. Tr., 166.

In contrast to Father's assertions, the evidence overwhelmingly supports that Baby
Ethan was settled in Italy. Mother had a home she owned in Italy and Father rented a home
there. Not only had Father lived in Italy for the past thirteen years and Mother never lived
anywhere else, but the parents had also established medical care for Baby Ethan in Italy. Trial
Tr. Feb. 3 Rep. Tr., 52. When he returned to Italy after his birth, the parents got him a
pediatrician and discussed medical decisions together as to his care. *Id.;* Trial Tr. Feb. 5, 2025
Rep. Tr., 8. And the child was receiving vaccines in Italy. *Id.*

Father presented text messages and testimony in an attempt to establish that Mother
had committed to moving to the United States, and that, had he known she would not move, he
would have never had a child with her. Trial Tr. Feb. 4, 2024 Rep. Tr., 118-19. The Court,
however, does not find these messages persuasive to establish a concrete intent to  move to the
United States.

As to Father's claims that he would never have had a child with Mother if they were
going to stay in Italy, Mother sent a text message to Father in September 2023, that states
"[w]hen we started dating you told me you would rather stay here than leaving me," to which
Father responded, "Yes it's true." Respondent's Exhibit DD at 2. Text messages further show
only general aspirations of moving to America rather than firm plans. For example, in one
exchange, Father stated, "I saw Vincenzo today. The gym trainer. He's also thinking of moving

to America for better business opportunities." Mother responded, "We will go, sooner or later. I promise." Respondent's Exhibit G at 1. This exchange indicates a general aspiration rather than a concrete plan.

Similarly, Father relied on hours of testimony about his Google search history spanning seventeen months to support his claims. *See* Respondent's Exhibit I; Trial Tr. Feb. 4, 2025 Rep. Tr., 13. The Court however finds this unconvincing for several reasons. First, it was unclear who conducted the searches, making it impossible to attribute them to a shared parental intent. Second, no evidence from Mother's electronic devices was submitted, and Father failed to provide any substantive proof linking the searches directly to her. Trial Tr. Feb. 5, 2025 Rep. Tr., 153. Third, the searches did not reflect concrete steps toward relocation, such as purchasing a home, securing employment, booking one-way tickets, or securing visas. *See generally* Respondent's Exhibit I.  Instead, they merely reflect general research into potential housing or school options. *Id.* Notably, Father himself admitted that the couple had only narrowed down their relocation options to four different cities, further underscoring the speculative nature of these discussions. Trial Tr. Feb. 5, 2025 Rep. Tr., 155.

Father presented evidence that Mother expressed an interest in moving, but this does not establish a firm plan. In one exchange, she told Father, "We need to move," to which he responded, "Trust me…we'll have an AMAZING life together in America." Respondent's Exhibit K at 1. Yet in another exchange, Father admitted uncertainty about Mother's desire to move to America, writing, "One day, I'll convince you," to which she simply responded, "I love you." Respondent's Exhibit L at 1. In another message, Father pleaded, "PLEASE LET'S GO TO AMERICA. PLEASE." Mother replied, "We are working on it." Respondent's Exhibit M at 2. Mr. La Via, Father's friend, testified that he had conversations with Father and Mother in America during their visit for Baby Ethan's birth. Trial Tr. Feb. 3, 2025 Part. Tr., 46-55. Mr. La Via testified that he discussed with Father and Mother the potential of them moving to the United States. *Id.* During his meeting with them in America, Mr. La Via testified that Mother and Father told him how much they enjoyed America and that Mother's children were enjoying American school. *Id.*

Further, Father presented as a witness a retired pastor, Marianne Allen, who he calls his counselor.[2] Ms. Allen testified that she met with both Mother and Father to counsel them, and that during meetings on or around February 2024, Mother had stated that she was willing to move back to America and the couple was in the process of finding houses or schools. *Id.* at 73-74. These conversations are however irrelevant because they happened before August 5, 2024, when Mother ended the relationship with Father and no longer wanted to move to America. Even if they were relevant, these conversations only reflect future possibilities, not imminent relocation.

The evidence is clear that an imminent move to America was not possible due to significant obstacles that prevented the parties' permanent relocation anytime in the near future.

First, the couple never purchased plane tickets to return to America permanently.

Second, as of August 5, 2024, the couple was no longer in a relationship, further hindering their ability to obtain immigration through marriage and diminishing Mother's desire to move to America. *See* Trial Tr. Feb. 3, 2025 Rep. Tr., 86.

Third, Mother had her three other children in Italy. Her youngest daughter and son, Clelia and Ettore, had scheduled visits with their father, Gigi. No testimony indicated that Gigi intended to move or had given permission for the children to live in another country. Father himself admitted during his testimony that Mother had never told him, "I talked to Gigi about moving to America, and he agreed. We get to go." Trial Tr. Feb. 5, 2025 Rep. Tr., 163. In fact, the couple had a conversation where Father expressed frustration over Mother's inability to commit to a move, accusing her of prioritizing the other children over their child together. He stated, "You think more about Clelia and Ettore than you do about Ethan and me." He then pressed her further, asking, "Answer the question, Claudia. Why don't we go in September or even October [to America]?" to which Mother responded, "Because I cannot… Because of my kids that do exist!" Respondent's Exhibit DD at 1-2.

Fourth, Mother and Gigi remain legally married in Italy, which could impact her ability to marry Father and obtain a U.S. visa. *See* Trial Tr. Feb. 3, 2025 Rep. Tr., 24-25.

---

[2] The parties have waived any applicable clergy-penitent privilege that would otherwise apply in federal court to preclude the disclosure of discussions with Ms. Allen.

Wrongful Removal and Concealment of Baby Ethan in America after Father's Taking

Father's argument that Baby Ethan became settled in America during his eighty-two-day stay is unpersuasive. *See* Trial Tr. Feb. 6, 2025 Rep. Tr., 16. Courts have consistently held that concealment prevents a child from becoming settled. *See e.g., Wigley v. Hares,* 82 So.3d 932 (Fla. Dist. Ct. App. 2011). A child cannot be considered "settled" in any meaningful sense when one parent is unaware of the child's whereabouts, daily life, and well-being, and has had minimal contact.

Even if an eighty-two-day stay after Father's taking of Baby Ethan could establish acclimatization—which it does not here—any such acclimatization resulted solely from Father's wrongful concealment of the location of Baby Ethan. During this time, he restricted Mother's contact to brief phone calls and withheld the child's location from her, as well as likely other friends and family members. *See generally* Petitioner's Exhibit 17. The record is void of any indication that Father had created a permanent home for Baby Ethan in America after his wrongful taking. Rather, Father's text messages during this time reveal that Father was staying in hotels and presumably living a nomadic lifestyle—a lifestyle that is incredibly difficult for any baby to adapt to, especially without their mother and normalized routine. *See generally* Petitioner's Exhibit 17. Thus, under these circumstances, there was no shared intent of the parents for Baby Ethan to settle in America and the child was not able to have any meaningful social connections or relationships. Recognizing settlement under these conditions would "undermine the very purpose of the Convention." *Wigley,* 82 So.3d at 942; *Lops v. Lops,* 140 F.3d 927, 946 (11th Cir. 1998) (finding that children were not settled when they were concealed from their mother and elaborate steps were taken to avoid detection).

The emotional toll of his concealment is evident from Mother's desperate text messages during this time:

- "Eric, when are you bringing him back? We need to see each other and hug and kiss. I miss him so much." Petitioner's Exhibit 17 at 30.

- "Please Eric bring [Baby Ethan] back as soon as possible, [Baby Ethan] needs his mother and I have the right to be with him too." *Id.* at 22.

- "I can't sleep, you are torturing me." *Id.* at 30.
- "Hey Eric, please come back with [Baby Ethan]. I can't sleep, I have palpitations. I beg you to come back. We can agree so that you can be [satisfied], and [Baby Ethan] can grow up with a loving father and a loving mother too." *Id.* at 58.

These messages underscore the emotional toll of Father's actions and confirm that the child's time in America cannot be considered "settled" in any sense.

The circumstances in this case are distinct from those in *Nisbet*, where the Ninth Circuit upheld the district court's conclusion that the child had not established habitual residence in Scotland. 124 F.4th at 590. The caregiving parent in that case had moved between different parts of the British Isles, repeatedly considered relocating elsewhere, and the mother was in Scotland on an expiring visa—factors that weighed against finding a settled intent to remain. *Id.* at 586.

Here, unlike in *Nisbet*, Baby Ethan had a clear and continuous connection to Italy. *See id.* He spent the majority of his life there, received medical care there, and had significant familial ties—including his mother's extended family and siblings. While the parents discussed moving to the United States, these discussions were speculative, and no concrete steps were taken to facilitate relocation. Moreover, legal, logistical, and familial barriers—such as Mother's lack of U.S. immigration status, her obligations to her other children in Italy, and the absence of any formal relocation plans—made any imminent move unrealistic.

In conclusion, the evidence overwhelmingly supports the determination that Baby Ethan's habitual residence is in Italy. The child's substantial familial and social ties in Italy are evident through his close relationships with his maternal family and siblings, who reside there. Furthermore, the substantial obstacles making an imminent relocation to the United States impossible collectively affirm that Baby Ethan's habitual residence is firmly rooted in Italy.

## 2. Violation of Custody Rights Under Italian Law

Having established that Baby Ethan's habitual residence was Italy, the Court must now determine (1) whether Father's removal of the child breached Mother's custody rights under Italian law and (2) whether Mother was exercising those rights at the time of removal. *See*

Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. §9003(e)(1) (establishing the burden of proof).

Custody Rights Under Italian Law

Under the Hague Convention, removal is wrongful if it violates the custody rights of the left-behind parent as recognized by the child's habitual residence. *Id.* Custody rights can be established by (1) operation of law, (2) judicial or administrative decision, or (3) agreement between the parents. Hague Convention art. 3, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89.

Italian law mandates that parental authority is exercised jointly unless otherwise determined by a court. *See* Code Civile [CC] art. 316 (Italy) ("A child is subject to the authority of its parents until majority or emancipation. The authority is exercised by both parents by mutual agreement."). Therefore, relocation to another country requires both parents' consent or court authorization. *See* Code Civil art. 144 (It.).

Here, Mother had custody rights under Italian law, and Father's unilateral removal of Baby Ethan without her consent or court authorization constituted a breach of those rights. If parents cannot agree on major decisions, Italian law provides a legal process for resolution, allowing either parent to seek court intervention. Instead of seeking approval from Italian courts, Father circumvented the legal process and took the child to America without authority. His dissatisfaction with visitation arrangements did not justify self-help; rather, his remedy was through the Italian legal system.

Father's Intent to Evade the Legal System

Father's own communications reveal his intent to evade the Italian legal system. Before leaving Italy, he asked an attorney whether Mother could legally "keep our son in Italy," to which his American attorney responded, "I cannot give you any legal advice as to the laws or legal system in Italy."[3] Respondent's Exhibit HH at 1. He testified that he consulted two Italian attorneys, both of whom advised him that under Italian law, Mother would retain primary custody and that he was unlikely to obtain additional parenting time beyond his existing two-

---

[3] Pursuant to Federal Rule of Evidence 502(a), by disclosing these text messages, Respondent has waived attorney-client privilege as to the specified conversations that were submitted and discussed concerning his communications with his attorneys, as the disclosure was intentional and pertains to the same subject matter, where fairness requires consideration of the disclosed and undisclosed information together.

hour daily visitation. Trial Tr. Feb. 5, 2025 Rep. Tr., 128-29. Additionally, he testified to discussing his options with social services and the Italian police, who reportedly told him: "She's the mother. She raises the child. You're the father. You support the mother." *Id.* at 136-37. Rather than seeking legal recourse, Father chose to remove the child to America, hoping for a more favorable outcome in U.S. courts.

After arriving in the U.S. with Baby Ethan, Father sent a message to his American lawyer inquiring: "Of all the cities in America to move to, which one would be best in terms of father-friendly judges and counties? Is there one that stands out above the rest?" Respondent's Exhibit HH at 10. Once again, this evidence demonstrates that Father had no plans as to a permanent move to America other than the taking of Baby Ethan to find a more sympathetic forum.

International Comity and the Hague Convention

The Hague Convention was founded on principles of international comity, ensuring that courts respect the custody determination of other signatory nations. *Souratgar v. Fair*, 720 F.3d 96, 108 (2nd Cir., 2013) ("the careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American children abducted to other nations-whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection.") (international citation and quotation omitted). Italy has the right to determine the custody of children who habitually reside there, regardless of their American citizenship. *Id.* ("In the exercise of comity, we are required to place our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it.") (internal quotation and citation omitted). The rule of law does not yield to personal grievances. Nor does it permit a parent to conceive a child in another country, establish a home there, and then, upon dissatisfaction with the relationship or living situation, remove the child in hopes of securing a more favorable outcome in a foreign jurisdiction. To rule otherwise would undermine the very purpose of the Hauge Convention.

At the time of Father's departure with Baby Ethan, no formal court order governed the parents' custody rights. However, the evidence establishes that an agreement existed

between the parties. *See* Trial Tr. Feb. 3, 2025 Rep. Tr., 50-51. By disregarding Italian law and removing the child without legal authorization, Father acted in clear violation of Mother's custodial rights. Criminal charges are currently pending against Father in Italy for the wrongful removal of Baby Ethan, and he acknowledged that an Italian attorney informed him that taking a child without the mother's permission "is a crime." Trial Tr. Feb. 6, 2025 Rep. Tr., 13, 15.

Accordingly, Father's unilateral removal of Baby Ethan not only breached Mother's custody rights under Italian law but also contravened the principles of international comity and the Hague Convention, warranting the child's prompt return to Italy for proper legal adjudication.

### 3. Father's Defenses

#### A. Grave Risk of Harm

There is a uniform acknowledgement among courts that the defenses available under the Convention should be interpreted narrowly. *See, e.g., Nicolson v. Pappalardo*, 605 F.3d 100, 107 (1st Cir. 2010); *Asvesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009); *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008) (using Article 13(b) defense); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) (using Article 13 defense); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 288 (3d Cir. 2006); *Miller v. Miller,* 240 F.3d 392, 402 (4th Cir. 2001); *Diorinou v. Mezitis*, 237 F.3d 133, 145 (2d Cir. 2001); *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996); *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995). This is to prevent the Convention from becoming "a dead letter." *See* Elisa Pérez-Vera, Explanatory Report, in 3 Actes et Documents de la Quatorzième session, 434-35 (1982), https://www.fjc.gov/content/311576/explanatory-report-eliza-perezvera-report (the Pérez-Vera Report is the official commentary of the reporter to the proceedings leading to the adoption of the 1980 Hague Convention by the Hague Conference on Private International Law). In fact, Article 18 provides that the defenses "do not limit the power of a judicial or administrative authority to order the return of the child at any time." Hague Convention art. 18. Thus, if the return of a child would further the aims of the Convention, Article 18 confers discretion to return a child even if a defense to return has been proven. *Id.*

Article 13(b) provides that a child need not be returned if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b). Grave risk is an affirmative defense that must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2). Concern with comity among nations argues for a narrow interpretation of the 'grave risk of harm' defense, but the safety of children is paramount. *Van De Sande v. Van De Sande*, 431 F.3d 567, 572 (7th Cir. 2005) (quotation omitted); *Danaipour v. McLarey*, 286 F.3d 1, 22 (1st Cir. 2002); *see also Colchester v. Lazaro*, 16 F.4th 712, 717 (9th Cir. 2021). In deciding whether grave risk exists, courts are to consider "both the magnitude of the potential harm and the probability that the harm will materialize." *Colon v. Montufar*, F. Supp. 3d 1280, 1292 (S.D. Fla. July 2, 2020) (citing *Souratgar v. Fair*, 720 F.3d 96, 103 (2d Cir. 2013)). A respondent parent can establish a grave risk of harm from abuse "where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014). Spousal violence may also "establish a grave risk of harm to the child, particularly when it occurs in the presence of the child." *Id.*; *see also Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (2016).

Here, Father accused Mother of domestic violence, attempting to commit suicide, and attempting to murder Baby Ethan. Trial Tr. Feb. 5, 2025 Rep. Tr., 34, 174. The Court finds that the evidence presented was not credible and did not meet the clear and convincing standard. The Court will address each accusation in turn.

Father testified that he took Baby Ethan to America to escape domestic violence, yet his own text messages and other statements do not support this conclusion. Father testified in Court that he was concerned that he would be "powerless back in Italy if mom was there with her children." *Id.* at 42. Father also alleges that Mother once threw the child at him saying "[h]ere, you can take care of the effing kid." Trial Tr. Feb. 4, 2025 Rep. Tr., 166. But Mother states that she has never thrown her child nor did this event ever occur. Trial Tr. Feb. 3, 2025 Rep. Tr., 77. And when Father was asked whether or not he reported this alleged abuse to the authorities, he admitted that while he contacted the police, he never filed a report because in his

words, "they were not interested." Trial Tr. Feb. 5, 2025 Rep. Tr., 173 He further claimed that

he once called the police to their home to report the abuse and took photos of them there as

evidence, yet he failed to submit any such photos as evidence or provide any corroborating proof

that this incident ever occurred. Trial Tr. Feb. 5, 2025 Rep. Tr., 173-74.

Father did submit a video that he recorded of Mother as supposed evidence of

Mother's abuse, in which he claimed she was acting erratic on the day of their breakup. *See*

Respondent's Exhibit T. However, the video does not demonstrate abuse by Mother—instead it

captures Father antagonizing her, withholding her child from her, and aggressively recording her

while close to her face as she attempts to push the phone away. *Id.* This conduct suggested

provocation, not victimization.

Lastly, Father alleged that Mother had kicked him in the back while they were in bed.

Trial Tr. Feb. 6, 2025 Rep. Tr., 4-5. However, this accusation was never mentioned in prior

statements of Father such as his declaration. *Id.* at 38. Father again referenced that he called the

police after domestic violence incidents and that when the Italian officers and paramedics

arrived and spoke with Mother, they determined that no further action was necessary. *See* Trial

Tr. Feb. 5, 2025 Rep. Tr., 174. No report was filed, no hospital visit occurred, and no

investigation was initiated by the Italian authorities. *See id.*

If Father had truly feared for his safety, there were numerous legal avenues available

to him before fleeing the country. He could have hired an attorney, sought a restraining order, or

petitioned the Italian courts for relief. Instead, he did none of these things. His failure to pursue

any of these legal remedies further undermines his credibility.

Father also presented text messages in which Mother confided in him about

experiencing brief periods of suicidal thoughts. Respondent's Exhibit R, S. However, Mother

clarified in her testimony that she would never act upon these thoughts. Trial Tr. Feb. 3, 2025

Rep. Tr., 82. In text messages, when Father asked her about them, she explicitly stated, "No, I

never thought of actually doing something. I won't ever do it for my children." Respondent's

Exhibit S at 1.

Father's most severe claim is that Mother attempted to kill herself and all of her children, including Baby Ethan, by leaving a pot burning on the stove. Trial Tr. Feb. 5, 2025 Rep. Tr., 174-75. But this accusation also lacks credibility. He testified that when he arrived at Mother's house at 9:30 p.m., he saw a pot on the stove with another burner turned on and immediately assumed this was a suicide and murder attempt. *Id.* Yet, his own actions in response tell a different story. He did not call the police or emergency services. Trial Tr. Feb. 5, 2025 Rep. Tr., 176. He did not evacuate the home—including the young children and his child sleeping inside. *Id.* at 176-77. He did not alert any of the immediate family members who were living next door. *Id.* Instead, when Mother awoke and asked him what was wrong, he simply told her, "It's okay. Go back to sleep." *Id.* at 178.

Mother testified that she had merely fallen asleep while cooking dinner for Father, accidentally leaving the stove on. Trial Tr. Feb. 3, 2025 Rep. Tr, 80-81. She also stated that her stove has a built-in safety feature preventing multiple burners being left on in the manner Father described. *Id.* Furthermore, Mother's oldest daughter, Chiara, testified that she had never even heard of this alleged suicide-murder until this lawsuit began, further calling into question Father's claims. Trial Tr. Feb. 3, 2025 Part. Tr., 42. And when Chiara was further asked about Mother's mental health, she confirmed that while there were difficult moments, Mother was fine overall. *Id.* at 40. She also testified that no one had ever raised with her serious concerns about Mother being a danger to herself or others, nor did she have any such concern herself. *Id.* at 42.

The evidence contradicts Father's narrative and instead demonstrates Mother's love and concern for Baby Ethan. The hundreds of text message exchanges between the parties submitted to the Court following Father's wrongful removal of the child paint a clear picture of a mother desperate to care for and reunite with her son. *See e.g.,* Petitioner's Exhibit 17. Even when Father refused to disclose their location, Mother's messages remained focused on Baby Ethan's well-being. She expressed concern about his health and safety, urging Father to "Please make sure to protect his skin from the sun, because today I noticed he has sunburn on both his arms and legs." *Id.* at 43. She persistently pleaded for updates, writing, "Why are you not

answering? How is [Baby Ethan]? Please let me see [Baby Ethan]. I won't take long." *Id.* at 33-34.

Mother's messages reflect her active role in her child's care. She reminded Father of medical needs, asking, "Are you giving him the drops the pediatrician prescribed [Baby Ethan]?" and noted, "Since he started to get the drops, he's grown up better." *Id.* at 36-37. Even in the midst of an unimaginable separation, she remained vigilant, noticing small details about her child's health: "I noticed [Baby Ethan's] tongue is a little white, like it happened before sometimes. Can you please clean it with water and baking soda and give [Baby Ethan] the fermenta plus D3 drops… as the pediatrician recommended?" *Id.* at 39-40. She even requested to be present, even remotely, for any medical visits, emphasizing, "If and when you take [Baby Ethan] to a pediatrician, it's very important to me that I hear live what he/she says, thank you." *Id.* The picture Father tried to paint of Mother does not match up with her countless text messages such as her writing, "[Baby Ethan] needs his mother. Bring him back. We can find the best solution for him, because we both love [Baby Ethan]." *Id.* at 57.

The evidence presented by Father does not meet the clear and convincing standard required to establish a grave risk of harm under Article 13(b). *See* Hague Convention art. 13(b). Courts have found grave risk where a parent exhibits persistent violent behavior, severe mental instability, a suicidal nature, substance abuse that manifested in violent outburst, physical and verbal abuse, and multiple threats to kill family members on multiple occasions. *See generally Garner v. Harris*, 641 F. Supp. 3d 343 (E.D. Tex. 2022). However, those circumstances are absent here.

Instead, this case aligns more closely with precedents like *Rishmawy v. Vergara,* 540 F. Supp. 3d 1246 (S.D. Ga. 2021) where courts have rejected grave risk defenses when allegations lack substantiation and there is no credible evidence of harm to the child. In that case the court held that no evidence was proffered to prove that a mother had harmed her children even though she suffered some mental-health problems; thus, insufficient evidence supported the assertion that the mother's mental health problems presented a current grave danger to the children. *Id.* at 1288-89 (finding that there was no grave risk because there was no evidence that

the mother physically, verbally, or mentally abused child; there was only one incident, before child's birth, in which mother was violent toward father as result of heated argument; there was no evidence that mother, child, or any of their relatives were targets of violence or threats; and the fact that the mother sought mental health treatment after her parent's death fell short of mental health issues that could pose grave risk).

Here, Father's accusations—ranging from domestic violence to attempted murder-suicide—are inconsistent, unsupported, and contradicted by the record—including his own actions and Mother's documented concern for Baby Ethan and her children's well-being. The overwhelming evidence instead portrays a loving and attentive mother, not a parent who poses an intolerable risk to her child. Given the Convention's presumption in favor of return and the absence of a valid defense, the Court orders that Baby Ethan be returned to Italy.

### B. Coercion

Father asserts that he was coerced to stay in Italy and therefore Italy cannot be Baby Ethan's habitual residence. Coercion of a child or caretaker to remain in a location will preclude a finding of habitual residence. Courts recognizing coercion have identified factors such as serious intimate partner violence, concealment of the purpose of a visit, and restraint of the movement of the other parent by confiscation of passports. *Loftis v. Loftis*, 67 F. Supp. 3d 798, 808 (S.D. Tex. 2014) (citing *Maxwell v. Maxwell*, 588 F.3d 245 (4th Cir. 2009); *Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045, 1055–57 (E.D. Wash. 2001); *In re Ponath*, 829 F. Supp. 363, 368 (D. Utah 1993)). Coercion is an important factor because "[t]he concept of habitual residence must . . . entail some element of voluntariness and purposeful design." *In re Ponath,* 829 F. Supp at 367.

Here, the Court finds no evidence of such coercion. As previously analyzed in relation to grave risk, there was no clear and convincing evidence of serious intimate partner violence. While Mother retained Baby Ethan's passport during Father's visitation periods, this was not an act of coercion but based on her fear that Father might abduct the child to the United States—a crime under Italian law. *See* Trial Tr. Feb. 3, 2025 Rep Tr., 58.

Moreover, the evidence establishes that Father had voluntarily lived in Italy for thirteen years and had willingly returned there after the brief trip to the United States for Baby Ethan's birth. *See* Trial Tr. Feb. 5, 2025 Rep. Tr., 9. The prospect of an imminent move to the United States faced significant practical obstacles, further undercutting any claim of coercion on Mother's part. Instead, the only coercive behavior present in this case was that of Father.

Mother testified that after Baby Ethan's birth, she believed Father deliberately delayed obtaining the child's passport to avoid returning to Italy. Trial Tr. Feb. 3, 2025 Rep. Tr., 43. Father himself admitted that he regretted securing the passport, stating that he should have withheld it to keep Mother and her children in the United States, thereby preventing her from returning to Italy with Baby Ethan. *See* Trial Tr. Feb. 5, 2025 Rep. Tr., 44. However, Father made the willful decision to return back to Italy and create a home for Baby Ethan there until the parties created concrete next steps. In sum, the Court fails to find any evidence of coercion that would change its holding that Italy is Baby Ethan's place of habitual residence.

## IV. ATTORNEYS' FEES AND COSTS

Article 26 of the Convention contains a discretionary fee-shifting provision that permits a court to award attorney fees and incidental costs to the person who successfully obtains the return of the child. Hague Convention art. 26. The language of the text is specifically that "the judicial or administrative authorities may, when appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child." *Id.* The Court **ORDERS** that Petitioner file the required motion as to these expenses and attorney's fees and costs to the Court by **March 3, 2025, at 5:00 p.m.** Respondent's Opposition shall be submitted by **March 18, 2025, at 5:00 p.m.**

## V. CONCLUSION

A child must be returned to its habitual residence if Petitioner has proven their case by a preponderance of the evidence. Petitioner has met their burden, thus the duty to return is mandatory.

This Court **ORDERS** that Baby Ethan be returned to Italy with his mother. The Orange County District Attorney is **ORDERED** to return the passports of Mother and Baby Ethan to Mother forthwith.

This case exemplifies the very conduct the Hague Convention sought to deter—the abduction of a child from their home country by a parent seeking a more sympathetic court. Father took a breastfeeding infant across international borders, believing that his American citizenship would grant him a more favorable forum. Meanwhile, Ms. Ciampa endured 82 days of heart wrenching separation from Baby Ethan. This Court will not serve as a refuge for such actions.


DATED:


_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

Parents' Relationship in Italy

1.   The parties, Petitioner, Claudia Ciampa, and Respondent, Eric Howard Nichols are parents to Baby Ethan, who was born on February 13, 2024. Respondent's Exhibit P.

2.   The parties' relationship began in Sorrento, Italy back in 2011. Trial Tr. Feb. 4, 2025 Rep. Tr., 7.

3.   The mother, Claudia Ciampa ("Mother" and "Petitioner"), is an Italian national who has lived in Italy her whole life. *Id.* at 15. The father, Eric Howard Nichols ("Father" and "Respondent"), is a United States citizen who moved to Italy thirteen years ago. Trial Tr. Feb. 5, 2025 Rep. Tr., 9.

4.   Father was teaching English in Italy since 2012, and the parties met at a café. *Id.* 10-12; Trial Tr. Feb. 4, 2025 Rep. Tr., 7. They became friends and then began a romantic relationship. Trial Tr. Feb. 4, 2025 Rep. Tr., 7-8. At this time, Mother had a five-year-old child. *See id.*

5.   The parties dated for one year beginning in 2011, and then ended their relationship. Trial Tr. Feb. 3, 2025 Rep. Tr., 21. After this, Mother then met Luigi Porzio ("Gigi") and eventually married him. *Id.* at 17. Mother had two children with Gigi. *Id.* at 16. Mother and Gigi remain legally married as of the present time but separated by mutual agreement after nine years of being together. *Id.* at 16-17, 45.

6.   After the mutual separation between Mother and Gigi, Mother reconnected with Father. *Id.* at 22. After dating for a while, Mother became pregnant with Father's child. *Id.* The parties never married as she is still legally married to Gigi. *Id.* 24-25.

7.   Mother, Father, and Mother's two youngest children traveled to Cincinnati, Ohio on January 26, 2024. Trial Tr. Feb. 3, 2025 Rep. Tr., 34. Mother gave birth to Baby Ethan on February 13, 2024, in Ohio. Respondent's Exhibit P at 1. Mother and Father obtained a U.S. Passport and social security card for Baby Ethan during this seven week stay in the United States. Trial Tr. Feb. 4, 2025 Rep. Tr., 153.

8.  The parties stayed with Respondent's brother, Darren Nichols, in Union, Kentucky until March 7, 2024. On March 7, 2024, the parties rented their own house located at 516 Kentaboo Ave, Florence, Kentucky. Memorandum of Contentions of Fact and Law filed by Respondent Eric Howard Nichols ("Respondent's Contentions of Fact and Law")(Dkt. 61), 3-4.

9.  On March 18, 2024, the parties returned to Italy with Baby Ethan and Mother's other children. Trial Tr. Feb. 3, 2025 Rep Tr., 47.

Baby Ethan's Wrongful Taking

10. After a couple months back in Italy, the parties' relationship became strained, and Mother ended the relationship with Father on August 5, 2024. *Id.* at 48. Following this, the parties negotiated a visitation schedule for Father to see Baby Ethan twice daily, from 9:00 to 11:30 am, and again from 7:00 to 8:00 p.m. *Id.* at 50-51. Mother found that the evening visitation interfered with Baby Ethan's sleep schedule and modified the visitation schedule to only the morning hours. *Id.*

11. Mother feared Father having the American passport and being alone with the child, so the parties agreed that Father would leave Baby Ethan's passport with Mother during his visits and Mother would return the passport to Father at the end of his visits. *Id.* at 58.

12. On August 23, 2024, Mother traveled with her children to Torre Suda, Puglia on a vacation to visit Mother's brother and sister. *Id.* at 92. Father traveled separately to Puglia to maintain visitation with Baby Ethan every day and even rented an Airbnb nearby to where Mother and her family were staying. *Id.* at 54-55.

13. On the morning of August 30, 2024, Father appeared at family's home for his parenting time with Baby Ethan *Id.* at 60. But unlike prior scheduled visits, Father refused to give mother Baby Ethan's American passport. *Id.* Father then did not return Baby Ethan at the agreed upon time of 10:00 am. *Id.* In response to numerous text messages from Mother, Father falsely stated that he was spending time with the child at local beaches, zoos, and water parks. *Id.* at 61-62. Mother sent countless messages and phone calls urging for the return of the infant. *See generally* Petitioner's Exhibit 17. Baby Ethan was breastfeeding at this point in time and Mother pleaded with Father for him to return the child so that she could breastfeed him as it was

causing her pain. *Id.* at 4, 7. Mother was so concerned that around 2:00 p.m. she filed a report
with the local police. Trial Tr. Feb. 3, 2025 Rep Tr., 62.

14.  It was not until around 9:30 p.m. that Father finally told Mother the truth—that he
had driven to the airport with the infant, had been flying to London, and then to the United
States. Petitioner's Exhibit 17 at 8. Mother continuously asked where Father was taking the
child in the United States and Father refused to disclose this information to her. *See generally*
Petitioner's Exhibit 17.

15. Father kept the breastfeeding infant from his mother for about 82 days, refusing to
disclose their location. *See* Trial Tr. Feb. 3, 2025 Rep Tr., 71.

16. On September 5, 2024, Mother signed a Hague Application. Notice of Removal
(Dkt. 1), Exhibit B Hague Petition at 8. On September 19, 2024, the Italian Central Authority
emailed a letter to the American Central Authority (the U.S. Department of Justice) requesting
assistance under the Hague Convention. *Id.* This letter indicated that Father might be living in
Mesa, Arizona, with friends based on information Mother had previously obtained. *Id.* On
September 26, 2024, the U.S. Department of Justice notified the California Attorney General's
Office of the Hague Application. *Id.* On October 3, 2024, the California Attorney General's
Office notified the Orange County District Attorney's Office Child Abduction Unit of the
application. *Id.* On October 24, 2024, the Orange County Superior Court issued an Emergency
Ex Parte Order and issued a Protective Custody Warrant for Baby Ethan Father was served on
November 19, 2024, by the Sheriff's Department of Orange County. *Id.*

17. Baby Ethan and Mother were reunited after her arrival in the United States in
November of 2024 and have remained together throughout these proceedings. *See* Trial Tr. Feb.
3, 2025 Rep Tr., 71.

Baby Ethan and his Family's Physical Presence in Italy

18. Father, an American citizen, has lived in Italy for the past thirteen years. His last
visit to the United States before traveling for Baby Ethan's birth, occurred "four or five years
ago." Trial Tr. Feb. 5, 2025 Rep. Tr., 9, 10. During his time in Italy, Father has worked as an

English teacher, conducting lessons from his apartment in Sorrento. *Id.* at 10-12. He does not own property in the United States. *Id.* at 14.

19. Mother, an Italian citizen, has lived in Italy for forty-six years, except for brief stays in Canada and Australia lasting a few months each. Trial Tr. Feb. 3, 2025 Rep. Tr., 15. She has continuously resided in her family home in Piano di Sorrento. *Id.* Mother does not hold U.S. citizenship or a visa. *Id.* at 24-25.

20. Prior to, and following Baby Ethan's birth, the parties maintained their respective residences and employment in Italy. Memorandum of Contentions of Fact and Law filed by Petitioner Claudia Ciampa ("Petitioner's Contentions of Fact and Law")(Dkt. 62), ¶ 7.

21. Baby Ethan was born in the United States and spent a little over a month there until Mother was able to travel. Trial Tr. Feb. 3, 2025 Rep Tr., 35. He then returned to Italy with his parents and siblings on March 18, 2024, and remained there until his wrongful removal on August 30, 2024—a period of approximately five months. *Id.* at 35, 47.

22. Baby Ethan is an American citizen and an Italian citizen, holding an Italian Tessera Sanitaria (social security card) and an Italian Identification card. *Id.* at 56-57. Baby Ethan was enrolled in Italy's healthcare system upon his return from the United States. *Id.*

23. The child's maternal grandmother and uncle live next door to Mother. Trial Tr. Feb. 3, 2025 Rep. Tr., 19-20.  Additionally, one of Mother's sisters resides in the same town, while her three other siblings live in various villages throughout Italy. *Id.* Mother testified that she has numerous extended family members in Italy, but none in the United States. *Id.*

24. Baby Ethan has a strong familial support system in Italy, including his maternal grandmother, maternal aunts, and cousins, who were actively involved in his daily life.

25.  Baby Ethan has three older siblings, all of whom were born and raised in Italy. *Id.* at 16-19. Mother's oldest daughter, Chiara, is 18 years old and primarily lived with Mother but also spent time with her father, Paolo Pastorino, who resides in Italy. *Id.* Mother's other son, Ettore, is eleven years old and her youngest daughter, Clelia, is nine years old. *Id.* Their father, Gigi, lives in Italy. *Id.* Mother and Gigi share custody of the children. *Id.*

26. Mother is present and plays an active role in all her children's lives.

27. Petitioners Exhibit 23, A and Exhibit 23, B are photographic evidence showing Father seated next to the grandmother while she held the child in her lap. Petitioner's Exhibit 23, A, B. After the wrongful removal, Father facilitated a video call between Baby Ethan and his maternal grandmother, whom Mother described as being "very close to Baby Ethan" *Id.* at 116; Trial Tr. Feb. 3, 2025 Rep. Tr., 70.

28. At the time of Baby Ethan's wrongful removal, Mother had been visiting family members in Italy, further demonstrating the child's direct connection to his maternal relatives. Trial Tr. Feb. 3, 2025 Rep. Tr., 92.

Baby Ethan's Dependency on Mother

29. Baby Ethan—being exclusively breastfed and under one year old—was dependent on Mother for care for the first six months of his life. Trial Tr. Feb. 3, 2025 Rep. Tr., 51.

30. Mother intended to continue breastfeeding Baby Ethan for approximately two and a half years, as she did with her other children. Trial Tr. Feb. 3, 2025 Rep. Tr., 95. However, after Father took Baby Ethan at around six months old, Mother was forced to cease breastfeeding and had to undergo medical treatment to do so. *Id.* at 94-95. She was then unable to resume breastfeeding upon being reunited with the child in the United States. *Id.*

31. Father was dissatisfied with Mother's breastfeeding in public and her feeding schedule. *Id.* at 78; Trial Tr. Feb. 4, 2025 Rep. Tr., 159-60, 180. Father asked the pediatrician in Italy how often she should be breastfeeding. Trial Tr. Feb. 3, 2025 Rep. Tr., 78.

32. Father insisted on feeding Baby Ethan from birth and required her to pump milk into a bottle to comply with his preference; if she did not, he would feed the baby formula against her wishes. *Id.* at 51-52.

33. Mother did not consent to feeding Baby Ethan formula. *Id.*; Trial Tr. Feb. 4, 2025 Part. Tr., 19.

34. There is no written agreement between the parties to prove that there was any agreement to stop breastfeeding Baby Ethan. Trial Tr. Feb. 5, 2025 Rep. Tr., 57-58.

35. The World Health Organization guidelines advise that infants should be breastfed on demand, with no bottles, teats, or pacifiers and that breastfeeding continue alongside

complementary foods for up to two years or beyond. World Health Organization, Breastfeeding, WHO, https://www.who.int/health-topics/breastfeeding#tab=tab_2 (last visited Feb. 14, 2025).

36.  After the wrongful taking when Baby Ethan was in the United States with Father, Mother sent Father a text message stating: "Instead of [Baby Ethan]'s mother breast milk, you told me you are giving formula to [Baby Ethan]. Did you decide your own or you asked a pediatrician?" Petitioner's Exhibit 17 at 56.

37.  Mother did not consent or have the intention of being physically separated from Baby Ethan despite the time agreed upon in the visitation schedule with Father.

Trip to America for the Birth of Baby Ethan

38.  The reason that the parties and Mother's children traveled to America for seven weeks in early 2024, was for Baby Ethan's birth and to ensure that Father could be present in the delivery room. Petitioner's Exhibit 22 at 7.

39. The parties intended for their stay in Kentucky to be temporary and the parties agreed that they would return to live in Italy following the birth of Baby Ethan. *Id.*

40. The parties bought round-trip tickets to Italy, which included a return flight. *Id.*

41. Mother brought to Kentucky her two minor children she shares with Gigi and had an agreement with Gigi in writing that stated that the children would be returned to Italy on March 17th. *See generally* Trial Tr. Feb. 3, 2025 Rep. Tr., 34.

42. Although the two younger children were temporarily enrolled in an American school, Mother ensured they remained in contact with their Italian school by having them complete homework assignments from the Italian school while attending the American school. Trial Tr. Feb. 3, 2025 Part. Tr., 9-11.

43. Father announced to his students that he would be out of Italy for seven weeks for the birth of his son and that he would be returning to his class on March 17, 2024. Petitioner's Exhibit 22 at 7, 9.

The Hope of Moving to America

44. The parties had a hope that one day they would move to America, but the parties had not made concrete plans to move permanently to the United States and they did not have shared intent to do so imminently.

45. Mother, an Italian citizen, had no U.S. visa or citizenship status and had not applied for any type of U.S. visa between the Summer of 2022 and the birth of her child in February 2024. Trial Tr. Feb. 3, 2025 Rep. Tr., 25.

46. Mother did not seek advice from an immigration attorney during this time to explore obtaining U.S. immigration status. *Id.*

47. Mother and Father never married, and there were no concrete plans for Father to marry Mother to secure a U.S. visa or citizenship. *Id.* at 26.

48. Father and Mother because of the birth of Baby Ethan "were not talking about getting married in a short amount of time." Trial Tr. Feb. 5, 2025 Rep. Tr., 166.

49. After Baby Ethan's birth when he returned to Italy, the parents got him an Italian pediatrician and discussed medical decisions together as to his care in Italy. And the child was receiving vaccines in Italy. Trial Tr. Feb. 3 Rep. Tr., 52; Trial Tr. Feb. 5, 2025 Rep. Tr., 8.

50. On September 10, 2023, Mother sent a message to Father stating "[w]hen we started dating you told me you would rather stay here than leaving me," to which Father responded, "Yes it's true." Respondent's Exhibit DD at 2.

51. Father sent a message to Father stating, "I saw Vincenzo today. The gym trainer. He's also thinking of moving to America for better business opportunities." Mother responded, "We will go, sooner or later. I promise." Respondent's Exhibit G at 1.

52. There is no substantive proof linking the google search history submitted as evidence to Mother. *See generally* Respondent's Exhibit I.

53. The google searches do not show evidence that Father and Mother purchased a home in America, secured employment, booked one-way tickets, or obtained Mother and her children visas. *See generally id.*

54. Father and Mother had only narrowed down the list of potential cities they would live in to four possible options. Trial Tr. Feb. 5, 2025 Rep. Tr., 155.

55. Mother did express an interest in moving to America one day.

56. Mr. La Via, Father's friend, had conversations with Father and Mother in America during their visit for Baby Ethan's birth. Trial Tr. Feb. 3, 2025 Part. Tr., 46-55. Mr. La Via discussed with Father and Mother the potential of them moving to the United States. *Id.* During his meeting with them in America, Mother and Father told him how much they enjoyed America and that Mother's children were enjoying American school. *Id.*

57. Marianne Allen is a retired pastor, not a psychiatrist or psychologist, but Father calls her his counselor. Trial Tr. Feb. 3, 2025 Part. Tr., 85.

58. Ms. Allen met with both Mother and Father to counsel them, and during meetings on or around February 2024, Mother had stated that she was willing to move back to America and the couple was in the process of finding houses or schools. *Id.* at 73-74.

59. On July 25, 2023, after Father messaged Mother about moving to America, he said "One day, I'll convince you," to which she simply responded, "I love you." Respondent's Exhibit L at 1.

60. On July 27, 2023, Father texted Mother "PLEASE LET'S GO TO AMERICA. PLEASE." Mother replied, "We are working on it." Respondent's Exhibit R, at 2.

61. There were significant obstacles that prevented Mother and Father from moving with Baby Ethan to America in the near future.

62. At the time of August 30, 2024, Mother had her three other children in Italy. Her younger daughter and son had scheduled visits with their father, Gigi. No testimony indicated that Gigi intended to move or had given permission for the children to live in another country.

63. Mother never told Father, "I talked to Gigi about moving to America, and he agreed. We get to go." Trial Tr. Feb. 5, 2025 Rep. Tr., 163.

64. Father stated in a conversation where Father expressed frustration over Mother's inability to move to America, "You think more about Clelia and Ettore than you do about Ethan and me." Respondent's Exhibit DD, at 1.

65. Father sent the message, "Answer the question, Claudia. Why don't we go in September or even October [to America]?" to which Mother responded, "Because I cannot… Because of my kids that do exist!" *Id.*

66. Mother and Gigi remain legally married in Italy, which impacts her ability to marry Father and obtain a U.S. visa. Trial Tr. Feb. 3, 2025 Rep. Tr., 24-25.

Wrongful Removal and Concealment of Baby Ethan in America after Father's Taking

67. During Baby Ethan's time in America after his wrongful taking, Father did not disclose the child's location to Mother. *See generally* Petitioner's Exhibit 17.

68. Father allowed Mother to see Baby Ethan through brief video calls, but never revealed the location of the child during these calls. *Id.*

69. After the child was taken to America by Father, Mother sent the following text messages:

- ○ "Please Eric bring [Baby Ethan] back as soon as possible, [he] needs his mother and I have the right to be with him too." Petitioner's Exhibit 17, at 22.

- ○ "Eric, when are you bringing him back? We need to see each other and hug and kiss. I miss him so much." *Id.* at 30.

- ○ "I can't sleep, you are torturing me." *Id.*

- ○ "Hey Eric, please come back with [Baby Ethan]. I can't sleep, I have palpitations. I beg you to come back. We can agree so that you can be [satisfied], and [Baby Ethan] can grow up with a loving father and a loving mother too." *Id.* at 58.

Father's Intent to Evade the Legal System

70. On August 5, 2024, Father texted his American attorney at the time "can she keep our son in Italy?" to which the attorney responded, "I cannot give you any legal advice as to the laws or legal system in Italy." Respondent's Exhibit D, at 2.

71. Father consulted two Italian attorneys, both of whom advised him that under Italian law, Mother would retain primary custody and that he was unlikely to obtain additional

parenting time beyond his existing two-hour daily visitation. Trial Tr. Feb. 5, 2025 Rep. Tr., 128-29.

72. Father discussed his options with social services and the Italian police, who reportedly told him: "She's the mother. She raises the child. You're the father. You support the mother." *Id.* at 136-37.

73. Father did not go to an Italian court to contest the custody or visitation schedule of Baby Ethan

74. After arriving in the U.S. with Baby Ethan, Father sent a message to his American lawyer on September 3, 2024, inquiring: "Of all the cities in America to move to, which one would be best in terms of father-friendly judges and counties? Is there one that stands out above the rest?" Respondent's Exhibit D, at 11.

International Comity and the Hague Convention

75. At the time of Father's departure with Baby Ethan, no formal court order governed the parents' custody rights. But there was an agreement as to visitation among the parties.

76. Criminal charges are currently pending against Father in Italy for the wrongful removal of Baby Ethan. Trial Tr. Feb. 6, 2025 Rep. Tr., 13, 15.

77. An Italian attorney told Father that taking a child without the mother's permission "is a crime." *Id.*

Father's Defense- Grave Risk of Harm

78. Father was concerned after Baby Ethan was born that he would be "powerless back in Italy if mom was there with her children." Trial Tr. Feb. 5, 2025 Rep. Tr., 42.

79. Father never filed a domestic abuse report with Italian police or Italian authorities. Trial Tr. Feb. 5, 2025 Rep. Tr., 173.

80. Father did not submit evidence of police coming to Mother's home in response to a call about domestic violence.  Trial Tr. Feb. 5, 2025 Rep. Tr., 173-74.

81. Respondent submitted video evidence that shows Father withholding her child from her and recording her while close to her face as she attempts to push the phone away. *See* Respondent's Exhibit T.

82. Father did not state in his declaration prior to trial that Mother had kicked him in the back while in bed. *See* Trial Tr. Feb. 6, 2025 Rep. Tr., 38.

83. No police report was ever filed concerning domestic abuse by Mother. *See* Trial Tr. Feb. 5, 2025 Rep. Tr., 174.

84. Mother nor Father ever went to the hospital for issues regarding domestic abuse or suicide. *See id.*

85. No investigations were conducted regarding domestic abuse by Mother by Italian authorities. *See id.*

86. Father never hired an attorney or sought a restraining order because of domestic abuse by Mother.

87. Mother asked Father to fix an appointment for her with the couple's counselor, to which Father responded, "When you told me a few days ago that you were thinking of suicide, it really scared me." Mother responded, "I'm sorry." Father said, "this made me think you were thinking of something to do," to which Mother responded "No, I never thought of actually doing something. I won't ever do it for my children." Respondent's Exhibit S at 1.

88. On May 29, 2024, Mother left a pot on the stove cooking and fell asleep with Baby Ethan. Father came home around 9:30 p.m. and saw the pot. Trial Tr. Feb. 3, 2025 Rep. Tr, 80-81.

89. Father did not call the police or emergency services in response to this. Father did not evacuate the home or remove the children who were sleeping from the home. Trial Tr. Feb. 5, 2025 Rep. Tr., 176. Father did not alert any of the immediate family members living next door. *Id.* at 176-77.

90. When Mother awoke to him coming home and seeing the pot, Father told Mother, "It's okay. Go back to sleep." *Id.* at 178.

91. Mother's oldest daughter never heard of this incident until this lawsuit began. Trial Tr. Feb. 3, 2025 Part. Tr., 42.

92. When Father and Mother went to the local police station on August 5, 2024, Father did not report specifically the incident on May 29, 2024, as a suicide attempt. Trial Tr. Feb. 5, 2025 Rep. Tr.,178-79.

93. No one has ever raised concerns regarding Mother's mental health with her oldest daughter, Chiara, who is nineteen. Trial Tr. Feb. 3, 2025 Part. Tr., 40.

94. After Father's taking of the child and while Father and Baby Ethan were in the United States, Mother sent the following text messages:

- "What is he eating?" Petitioner's Exhibit 17 at 18.
- "Please make sure to protect his skin from the sun, because today I noticed he has sunburn on both his arms and legs." *Id.* at 43.
- "Are you giving him the drops the pediatrician prescribed [Baby Ethan]?" and noted, "Since he started to get the drops, he's grown up better." *Id.* at 36-37.
- "I noticed [Baby Ethan's] tongue is a little white, like it happened before sometimes. Can you please clean it with water and baking soda and give [Baby Ethan] the fermenta plus D3 drops… as the pediatrician recommended?" *Id.* at 39-40.
- "If and when you take [Baby Ethan] to a pediatrician, it's very important to me that I hear live what he/she says, thank you." *Id.* at 40.

Father's Defense- Coercion

95. Father had voluntarily lived in Italy for thirteen years and had willingly returned there after the brief trip to the United States for Baby Ethan's birth. *See* Trial Tr. Feb. 5, 2025 Rep. Tr., 9.

96. Father testified that he regretted securing an American passport for Baby Ethan and that he wishes he would have withheld the passport to keep Mother and her children in the

United States and prevent them from returning to Italy with Baby Ethan *See* Trial Tr. Feb. 5, 2025 Rep. Tr., 44.

## CONCLUSIONS OF LAW

Legal Background- Hague Convention

97. This case arises under the Hague Convention's International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§9001 *et seq.*

98. The 1980 Hague Convention on the Civil Aspects of International Child Abduction is a multilateral treaty that provides authority for the expeditious physical return of a child who has been removed or retained from the habitual residence, in violation of the custody rights of the left-behind parent. Hague Convention on the Civil Aspects of International Child Abduction pmbl., arts. 1, 3, Oct. 25, 1980, 1343 U.N.T.S. 89.

99. The United States signed the 1980 Hague Convention in 1981, and Congress ratified the Convention in 1986. Hague Convention, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89. Italy is also a party to the convention. *Id.*; Hague Conference on Private International Law, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (Feb. 11, 2025). Congress then passed implementing legislation, the International Child Abduction Remedies Act (ICARA) in 1988. 22 U.S.C. §§ 9001–9011 (1988), Pub. L. 100–300, § 2, Apr. 29, 1988, 102 Stat. 437.

100. The primary purpose of the Hague Convention was to preserve the status quo that existed before a child's removal, and to deter would-be abductors from removing children to other jurisdictions in search of a more sympathetic court. Pub. Notice 957, 51 Fed.Reg. 10494, 10505 (1986).

101. The policy underlying the Convention is "the interest of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (internal citation and quotation omitted).

-41-

102.    The Court's purview is limited to deciding if a child was wrongfully

removed or retained away from their habitual residence, and if so, to order the child's return to

that nation. *Id.* at 671-72 (citing 22 U.S.C. § 9003(e)(1), § 9001(a)(4)).

103.    The elements of the case for return are that the person or parent petitioning

for the return must show by a preponderance of the evidence that the child:

1. Is under the age of sixteen;

2. Has been wrongfully removed or retained;

3. Has been wrongfully removed or retained from his or her habitual
   residence; and

4. Has been wrongfully removed or retained in violation of the custody
   rights of the left-behind parent.

Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(1)

(establishing the burden of proof).

104.    If the petitioner has proven the elements above in accordance with their

burden, the Court must order the return of the child unless a defense to return is established.

Hague Convention arts. 12–13, 20, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(2).

Habitual Residence

105.    The determination of habitual residence is "a fact-driven inquiry into the

particular circumstances of the case." *Monasky,* 589 U.S. at 79. It is a totality-of-the-

circumstances approach that examines the "family and social environment in which [the child's]

life has developed." *Id.* at 77 (internal citation omitted).

106.    Factors relevant in this analysis  are the child's age, meaningful

connections with the people and place in the new country, immigration status of the caregiving

parents, and the length of time the child was physically located in a particular place. *Id.* at 78 n.3

(internal citations omitted).

Habitual Residence- Physical Presence

107.    While physical presence of the child alone is not dispositive, it must be

considered alongside meaningful social connections and a sense of environmental normalcy. *See*

*Nisbet,* 124 F. 4th at 584 (citing *Monasky,* 589 at 81). When physical presence fails to yield meaningful social connections, courts assign it little weight in habitual-residence determinations. *Id.*

108.    This case is distinct from *Nisbet,* where the Ninth Circuit held that children lacked meaningful ties to Scotland despite physical presence, because, in that case, the children had not formed friendships at nursery school, had no contact with their extended family, and had a father who had been incarcerated since birth. *See* 124 F.4th at 585.

109.    Baby Ethan's physical presence for a majority of his life was in Italy—where his maternal family resides, including Mother's three other children. Baby Ethan has significant familial and social ties to Italy, which strongly supports the conclusion that Italy, rather than the United States, is his habitual residence.

Habitual Residence- Intentions and Circumstances

110.    For older children, courts often apply the *Monasky* factors to determine whether the child has acclimatized to a place; however, an infant is too young to acclimatize to their surroundings. 589 U.S. at 78. Thus, "[b]ecause children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations." *Id.; see also Douglas v. Douglas*, No. 21-1335, 2021 WL 4286555, at *5 (6th Cir. Sept. 21, 2021), cert. denied (2022) (facts concerning parental intent may be relevant to the determination whether a particular place is the child's "home") (citation omitted).

111.    Because parents often dispute their intentions during litigation, "the court should look at actions as well as declarations in determining [parental intent]." *Olivia v. Espinoza,* No.: 20CV01133-JAH-DEB, 2021 WL 4554579 at *6 (S.D. Cal. Oct. 5, 2021) (citing *Walker v. Walker,* 701 F.3d 1110, 1119 (7th Cir. 2012).

112.    A relevant factor in determining habitual residence of infants is an infant's dependency on their parents for care. *see Douglas,* No. 21-1335, 2021 WL 4286555 at *6 (noting that the eleven-month-old was dependent on mother's care from birth to time of child's removal); *Ahmed v. Ahmed,* No. 3:16-CV-142, 2016 WL 4691599, at *7 (E.D. Tenn. Sept. 7,

2016), aff'd, 867 F.3d 682 (6th Cir. 2017) (citing *Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004)).  Here, Baby Ethan was being exclusively breastfed and under one year old; thus, he was dependent on Mother for care for the first six months of his life. This dependency underscores that the parents' intentions and circumstances never contemplated physical separation of Mother and Baby Ethan. Thus, there was no shared intent by Mother and Father for Baby Ethan to be removed from Mother's care at six months old. In sum, if Mother could not permanently move to the United States at a point in time, it follows that the child was not meant to go either.

113.     A relevant factor in determining habitual residence is short trips to other countries, particularly focusing on the duration of the child's stay in the location and meaningful social connections to the place and people. *See, e.g. Foster v. Foster*, 429 F. Supp. 3d 589, 608 (W.D. Wis. 2019) (considering previous limited stays); *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) (considering period of time child was located in a place); *Holder v. Holder*, 392 F.3d 1009, 1014 (9th Cir. 2004) (considering changes in geography). The parents' seven week stay in America for the birth of Baby Ethan was temporary and did not alter Baby Ethan's habitual residence.

114.     A relevant factor in determining habitual residence is the parent's immigration status. *See Kijowska v. Haines*, 463 F.3d 583, 588 (7th Cir. 2006); *In re B. del C.S.B.*, 559 F.3d 999, 1011 (9th Cir. 2009); *Hernandez v. Garcia Peña*, 820 F.3d 782, 788 (5th Cir. 2016) (the parents' and child's immigration status is one relevant factor in a multifactor test). Because Mother was not an American citizen and no steps had been taken to obtain her American citizenship, this factor demonstrates that the parents did not have a shared intent to move to America in the near future.

115.     Courts have consistently held that concealment prevents a child from becoming settled. *See e.g., Wigley,* 82 So.3d. A child cannot be considered "settled" in any meaningful sense when one parent is unaware of the child's whereabouts, daily life, and well-being, and has had minimal contact. Father, wrongfully concealed Baby Ethan in America from Mother. Thus, any evidence of Baby Ethan acclimatizing to America after his wrongful taking

does not contribute to the Court's analysis of habitual residence. *Id.* at 942; *Lops v. Lops,* 140 F.3d 927, 946 (11th Cir. 1998) (finding that children were not settled when they were concealed from their mother and elaborate steps were taken to avoid detection).

116.    Father's subjective intent to move does not constitute a change in habitual residence.

117.    This case is distinct from *Nisbet,* where the Ninth Circuit found that Scotland was not the children's habitual residence because the caregiving parent moved frequently out of Scotland, repeatedly considered relocating elsewhere, and the mother was in Scotland on an expiring visa. 124 F.4th at 590.

118.    In this case, Baby Ethan had a clear and continuous connection to Italy, spent the majority of his life there, received medical care there, and had significant familial ties—including his mother's extended family and siblings. While the parents discussed moving to the United States, these discussions were speculative, and no concrete steps were taken to facilitate relocation. Moreover, legal, logistical, and familial barriers—such as Mother's lack of U.S. immigration status, her obligations to her other children in Italy, and the absence of any formal relocation plans—made any imminent move unrealistic.

119.    Baby Ethan's habitual residence was Italy at the time of his removal.

Violation of Custody Rights Under Italian Law

120.    After determining habitual residence, the Court must determine (1) whether Father's removal of the child breached Mother's custody rights under Italian law and (2) whether Mother was exercising those rights at the time of removal. *See* Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. §9003(e)(1) (establishing the burden of proof).

Custody Rights Under Italian Law

121.    Under the Hague Convention, removal is wrongful if it violates the custody rights of the left-behind parent as recognized by the child's habitual residence. *Id.* Custody rights can be established by (1) operation of law, (2) judicial or administrative decision, or (3) agreement between the parents. Hague Convention art. 3, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89.

122.    Italian law mandates that parental authority is exercised jointly unless otherwise determined by a court. *See* Code Civile [CC] art. 316 (Italy) ("A child is subject to the authority of its parents until majority or emancipation. The authority is exercised by both parents by mutual agreement.").

123.    Therefore, relocation to another country requires both parents' consent or court authorization. *See* Code Civil art. 144 (It.).

124.    Mother had custody rights under Italian law, and Father's unilateral removal of Baby Ethan without her consent or court authorization constituted a breach of those rights.

International Comity and the Hague Convention

125.    The Hague Convention was founded on principles of international comity, ensuring that courts respect the custody determination of other signatory nations. *Souratgar v. Fair*, 720 F.3d 96, 108 (2nd Cir., 2013) ("the careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American children abducted to other nations-whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection.") (international citation and quotation omitted).

126.    Italy has the right to determine the custody of children who habitually reside there, regardless of their American citizenship. *Id.* ("In the exercise of comity, we are required to place our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it.") (internal quotation and citation omitted).

127.    By disregarding Italian law and removing the child without legal authorization, Father acted in clear violation of Mother's custodial rights.

128.    Under the Hague Convention, Baby Ethan's removal from Italy was wrongful.

Father's Defenses- Grave Risk of Harm

129.    There is a uniform acknowledgement among courts that the defenses available under the Convention should be interpreted narrowly. *See, e.g., Nicolson v.*

*Pappalardo*, 605 F.3d 100, 107 (1st Cir. 2010); *Asvesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009); *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008) (using Article 13(b) defense); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) (using Article 13 defense); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 288 (3d Cir. 2006); *Miller v. Miller,* 240 F.3d 392, 402 (4th Cir. 2001); *Diorinou v. Mezitis*, 237 F.3d 133, 145 (2d Cir. 2001); *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996); *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995).

130.    Article 18 provides that the defenses "do not limit the power of a judicial or administrative authority to order the return of the child at any time." Hague Convention art. 18. Thus, if the return of a child would further the aims of the Convention, Article 18 confers discretion to return a child even if a defense to return has been proven. *Id.*

131.    Article 13(b) provides that a child need not be returned if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Id.* at art. 13(b).

132.    Grave risk is an affirmative defense that must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

133.     In deciding whether grave risk exists, courts are to consider "both the magnitude of the potential harm and the probability that the harm will materialize." *Colon v. Montufar*, F. Supp. 3d 1280, 1292 (S.D. Fla. July 2, 2020) (citing *Souratgar v. Fair*, 720 F.3d 96, 103 (2d Cir. 2013)).

134.    A respondent parent can establish a grave risk of harm from abuse "where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014). Spousal violence may also "establish a grave risk of harm to the child, particularly when it occurs in the presence of the child." *Id.*; *see also Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (2016).

135.    The evidence presented by Father does not meet the clear and convincing standard required to establish a grave risk of harm under Article 13(b).

136.     Courts have found grave risk where a parent exhibits persistent violent behavior, severe mental instability, suicidal nature, substance abuse that manifested in violent outburst, physical and verbal abuse, and multiple threats to kill family members on multiple occasions. *See Garner v. Harris*, 641 F. Supp. 3d 343 (E.D. Tex. 2022)*.*

137.     There is no evidence present in this case of persistent violent behavior, severe mental instability, suicidal nature, substance abuse that manifested in violent outburst, physical and verbal abuse, and multiple threats to kill family members on multiple occasions.

138.     This case is analogous to *Rishmawy v. Vergara,* 540 F. Supp. 3d 1246 (S.D. Ga. 2021) where the grave risk defense was rejected because the party's allegations lacked substantiation and there was no credible evidence of harm to the child. In that case, no evidence was proffered to prove that a mother had harmed her children even though she suffered some mental-health problems; thus, there was no error in the district court's conclusion that insufficient evidence supported the assertion that the mother's mental health problems presented a current grave danger to the children. *Id.* at 1288-89.

139.     Respondent did not meet his burden as there is no clear and convincing evidence that returning Baby Ethan to Italy would expose him to a grave risk of harm.

140.     Father's claims of abuse and risk are unsupported and insufficient under Article 13(b).

Father's Defenses-Reliance on Legal Advice

141.     Father's reliance on legal advice, even assuming good faith reliance, is not a valid defense under the Hague Convention.

Father's Defenses- Coercion

142.     Coercion of a child or caretaker to remain in a location will preclude a finding of habitual residence. Courts recognizing coercion have identified factors such as serious intimate partner violence, concealment of the purpose of a visit, and restraint of the movement of the other parent by confiscation of passports. *Loftis v. Loftis*, 67 F. Supp. 3d 798, 808 (S.D. Tex. 2014) (citing *Maxwell v. Maxwell*, 588 F.3d 245 (4th Cir. 2009); *Tsarbopoulos v.*

*Tsarbopoulos*, 176 F. Supp. 2d 1045, 1055–57 (E.D. Wash. 2001); *In re Ponath*, 829 F. Supp. 363, 368 (D. Utah 1993)).

143.    There is no evidence that Mother coerced Father to remain in Italy after the birth of Baby Ethan.

## IV.    CONCLUSION

144.    A child must be returned if Petitioner's burden is met, and the wrongful removal or retention took place within twelve months of the commencement of the proceedings. The duty to return is mandatory.

145.    This Court Orders that Baby Ethan be returned to Italy with his mother.

146.    The Orange County District Attorney is **ORDERED** to return the passports of Mother and Baby Ethan to Mother forthwith.


DATE: February 18, 2025

Hon. David O. Carter

United States District Judge